UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

      v.

José Luis Guerrero Nuñez, et al.

Case No. 24-cr-026-SE
Opinion No. 2025 DNH 015

**O R D E R**

After a lengthy drug-trafficking investigation, Drug Enforcement Administration agents and New Hampshire police officers arrested José Luis Guerrero-Nuñez at an apartment in Lowell, Massachusetts pursuant to an arrest warrant. Shortly after the arrest but while the officers were still in the apartment, DEA agents dialed two cell phone numbers used to arrange drug purchases during the investigation. The agents followed the sound of the ringing to the locations of the phones. At least one of the phones was in the bedroom closet where the agents had found Guerrero-Nuñez hiding. The agents seized the phones and subsequently obtained a warrant to search their contents.

Guerrero-Nuñez moves to suppress all of the evidence derived from the entry into the apartment, including the two cell phones, arguing that the entry into the apartment and seizure of the phones violated his Fourth Amendment rights. The government argues first that Guerrero-Nuñez does not have standing to challenge the entry and seizure. Second, the government argues that the officers[1] lawfully entered the apartment pursuant to an arrest warrant and after another occupant consented to the entry. Third, the government argues that the seizure of the cell phones

---

[1] For ease of reference, if not discussing specific individuals, the court will use "officers" to describe both the New Hampshire police officers and the DEA agents who arrested Guerrero-Nuñez and seized the cell phones.

was permissible under the plain view and exigent circumstances exceptions to the Fourth Amendment's warrant requirement. Lastly, the government argues that, even if the court finds that the seizure of the cell phones violated Guerrero-Nuñez's constitutional rights, it should not suppress evidence that the officers heard the two cell phones ring in the apartment when they called the numbers during Guerrero-Nuñez's arrest.

The court held an evidentiary hearing on Guerrero-Nuñez's motion on January 13, 2025. For the following reasons, the court finds that the officers lawfully entered the apartment to arrest Guerrero-Nuñez. Likewise, the evidence that the cell phones rang in the apartment is admissible. Because no exceptions to the warrant requirement apply, however, the officers violated Guerrero-Nuñez's Fourth Amendment rights when they seized the cell phones.

Background[2]

In 2023, the Seabrook police department notified the DEA of a suspected drug distribution network in its area. The department provided the DEA with a phone number, ending in 5540, associated with an individual in the network. Based on that information, undercover DEA agents began arranging narcotics purchases by calling the 5540 number and speaking with an individual who identified himself as Erik. In 2023, the DEA orchestrated purchases of fentanyl, methamphetamine, or both, on 12 separate occasions using the 5540 number.

Although the phone calls to arrange the drug buys occurred at various times, the transactions usually occurred between 11:00 a.m. and 2:00 p.m. Over the course of the 12 buys, the undercover agents met and purchased narcotics from three different people. They did not

---

[2] The court makes these factual findings based on the testimony and other evidence offered at the suppression hearing.

believe that any of those individuals was Erik because the individuals would not negotiate purchases during transactions and instead directed the undercover agents to contact the 5540 number.

On January 24, 2024, an undercover agent contacted Erik at the 5540 number to arrange an in-person meeting at a restaurant in Portsmouth, New Hampshire. Erik arrived at the meeting in a red Jeep Grand Cherokee with Massachusetts license plates. He was a passenger in the vehicle. During the meeting, a DEA surveillance team placed a phone call to the 5540 number. Immediately, the agents observed Erik silence a call on his phone.

After Erik and his companion left the meeting in the Jeep, New Hampshire state police executed a traffic stop. The officers learned that the Jeep was registered to Mirtha Lara Lara at 478 Riverside Drive, Apartment 204 in Lawrence, Massachusetts. The DEA subsequently learned that Erik, who was identified as Guerrero-Nuñez, had been in the same car when police pulled it over in December 2021.[3] The car was at that time registered to someone other than Lara Lara, though it was not registered to Guerrero-Nuñez.

At or after the January 24, 2024 meeting, the undercover agents received another number to use to contact Guerrero-Nuñez, ending in 2361. Undercover agents continued to arrange drug buys with Guerrero-Nuñez using both the 5540 number and the 2361 number. In the days and weeks following the meeting, undercover agents arranged four or five drug buys with Guerrero-Nuñez using the 2361 number.

---

[3] The evidence was unclear as to whether Guerrero-Nuñez was the driver or the passenger of the Jeep during the December 2021 traffic stop.

In February 2024, the government indicted Guerrero-Nuñez and four others on charges of conspiracy to distribute and to possess with the intent to distribute controlled substances. The DEA obtained arrest warrants for Guerrero-Nuñez and the other alleged co-conspirators. On March 14, 2024, the agents set out to effectuate all five arrests.

The DEA planned to arrest the five alleged co-conspirators at three separate locations. The first was in Portsmouth, New Hampshire. On March 13, 2024, the undercover agents had arranged to complete a narcotics purchase of three pounds of methamphetamine and a kilogram of fentanyl at this location over several conversations with Guerrero-Nuñez at the 2361 number. The undercover agents continued those conversations on that same number beginning at 10:00 a.m. on March 14, 2024. They planned to purchase the narcotics and then arrest the sellers.

The second location was an apartment at 30 Danbury Drive in Methuen, Massachusetts. Undercover agents had previously completed several narcotics purchases at that address, which they also had under surveillance.

The third location was an apartment complex at 478 Riverside Drive in Lawrence, Massachusetts. The DEA agents planned to effectuate arrests at two different apartments in the building. They planned to arrest Guerrero-Nuñez in Apartment 204 and his son in Apartment 103.

The DEA pinpointed Apartment 204 as Guerrero-Nuñez's address for several reasons. First, on December 5, 2023, the DEA obtained a search warrant for GPS ping data related to the 5540 number. That data, which covered a roughly two-week period from November 20, 2023, to December 5, 2023, showed that the 5540 number was in the area of 478 Riverside Drive several times a day.

Second, on January 30, 2024, the DEA received authorization to utilize a pen register for the WhatsApp account associated with the 5540 number.[4] From that date through March 2024, the 5540 number used Wi-Fi signals from six unique Comcast identifications. The DEA subpoenaed records from Comcast for the three IP addresses most frequently associated with those signals. The top two came from Apartment 204 at 478 Riverside Drive.

Finally, the Jeep in which Guerrero-Nuñez arrived at the January 24, 2024 meeting with the undercover agents was registered to Apartment 204. As mentioned above, police had also encountered Guerrero-Nuñez in that vehicle during a traffic stop in December 2021. His presence in the Jeep on both occasions more than two years apart led the officers to associate Guerrero-Nuñez with both the Jeep and its registered address.

The DEA set up surveillance at the apartment complex on the morning of March 14, 2024. Based on that surveillance, they believed that Guerrero-Nuñez was in Apartment 204 that day. Undercover agents had been communicating with Guerrero-Nuñez on the 2361 number several times that morning to arrange the narcotics purchase in Portsmouth. Based on the location data discussed above, the DEA believed that Guerrero-Nuñez completed calls arranging drug buys from that apartment, especially midday when most of the monitored transactions took place. In addition, the surveillance team observed Lara Lara return home with groceries in the Jeep, and had not observed Guerrero-Nuñez leave the apartment building at all that day.

After Lara Lara went inside with the groceries, the officers approached the apartment complex to effectuate the arrests of Guerrero-Nuñez and his son. They entered the building with

---

[4] "[T]he term 'pen register' means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication . . . ." 18 U.S.C. § 3127.

assistance from the Lawrence Fire Department. Roughly eight to ten officers went to the second floor to Apartment 204. At least two of the agents turned on their body cameras. The time was approximately 12:23 p.m.

The officers were dressed in plainclothes, but each wore external body armor with police markings. The officers' firearms were all holstered. Officer John Hannigan knocked on the apartment door. He said "hello" and, as a ruse to get Lara Lara to come to the door, said that he believed that she had dropped some groceries. Lara Lara came to the door and, with the door still closed, had a brief conversation with Officer Hannigan. He asked if she spoke English, to which Lara Lara replied "Español." Officer Hannigan then identified himself in Spanish as a police officer, and Lara Lara opened the door.

Officer Hannigan then spoke English for the remainder of his brief interaction with Lara Lara at the doorway. He testified that he did so because his ability to speak Spanish is limited and that it seemed clear from their conversation that Lara Lara could understand him. Officer Hannigan asked if anyone else was home, to which Lara Lara replied "yes."[5] He asked if Erik was home and Lara Lara repeated the name as if she were asking a question and suggesting that she did not know him. Officer Hannigan then asked if he and his fellow officers could enter the apartment. Lara Lara stepped aside out of the doorway and may have said "okay."

Upon entering, Officer Hannigan again asked if anyone else was in the apartment and asked Lara Lara to bring them out. She led the officers to a bedroom in the back of the

---

[5] There was conflicting evidence as to Lara Lara's answer to Officer Hannigan's question of whether anyone else was home. The DEA-6 Form, which is a report of the arrests written by another agent at the scene, states that Lara Lara said that no one else was home. Officer Hannigan and Special Agent Andrew Frigon testified that Lara Lara said that there was someone else home, and their testimony is consistent with the audio from the body camera footage. Regardless, Lara Lara's answer to that question does not change the court's analysis as to whether a Fourth Amendment violation occurred.

apartment. After opening the door to the bedroom, Lara Lara asked in English, "What is the name?" Officer Hannigan responded with "Erik," and Lara Lara again repeated the name as a question.

While Officer Hannigan and an agent walked through the bedroom door Lara Lara had opened, Special Agents Frigon and Michael Dunn entered a second bedroom on the left. Along the wall was a closet with a partially-closed folding door. As Special Agent Dunn opened the door, Special Agent Frigon saw Guerrero-Nuñez hiding, wearing only his underwear. The two agents ordered him to come out of the closet, placed him in handcuffs, and led him to the living room where he was directed to sit on a chair. One of the agents briefly checked the remainder of the closet, which was cluttered with clothes and other items, to make sure no one else was hiding.

The officers conducted a protective sweep of the apartment, during which they saw prescription medication bottles with Guerrero-Nuñez's name on them. In addition to coordinating with the officers carrying out the arrest in Apartment 103, the officers in Apartment 204 began preparing Guerrero-Nuñez for transport to Boston, Massachusetts. They explained the process and next steps to Lara Lara and had her get Guerrero-Nuñez some clothes. Their conversation with Lara Lara was primarily in English.

After the protective sweep, while still in the apartment preparing Guerrero-Nuñez for transport, Special Agent Frigon called both the 5540 and 2361 numbers. Although Special Agent Frigon could not recall which number he called first, the first phone rang and was found by Special Agent Brian Silvestro in the bedroom closet where Guerrero-Nuñez had been hiding. The second phone also rang, and Special Agent Silvestro found it somewhere in the same bedroom, though he could not recall whether he found it in the closet. The agents seized the phones, both

7

of which were manufactured by Samsung. Eventually, after obtaining a warrant, the agents searched both phones.

Standard of Review

A defendant who moves to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation has occurred. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016). This includes the burden of showing that he was subjected to a warrantless search or seizure. United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the government to prove by a preponderance of the evidence that the search or seizure was lawful. See United States v. Matlock, 415 U.S. 164, 178 n.14 (1974); United States v. Manubolu, 13 F.4th 57, 69 (1st Cir. 2021).

Discussion

Guerrero-Nuñez argues that the warrantless seizure of the two cell phones violated his Fourth Amendment rights for two reasons. He first argues that the officers did not lawfully enter the apartment, and so any evidence obtained during the course of his arrest must be suppressed. Second, he contends that even if the officers were lawfully in the apartment, the circumstances did not present an exception to the warrant requirement that would have allowed the officers to seize the phones. The government responds that Guerrero-Nuñez lacks standing to challenge the seizure of the cell phones because he has not alleged any facts that would establish a reasonable expectation of privacy in either the apartment or the phones. It also contends that even if Guerrero-Nuñez does have standing, the officers were lawfully in the apartment and had grounds

to seize both cell phones under either the plain view or exigent circumstances exception to the warrant requirement. Finally, the government argues that even if the officers were not entitled to seize the cell phones, the act of calling the phones was not a search and the court should not suppress the evidence that the phones rang in the apartment after Special Agent Frigon called them.

I.    Standing

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy" in the area searched and in relation to the items seized. Rakas v. Illinois, 439 U.S. 128, 143 (1978). The burden to show this reasonable expectation of privacy, commonly referred to as Fourth Amendment "standing,"[6] is on the defendant, and it "must be carried at the time of the pretrial hearing and on the record compiled at that hearing." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

In determining whether the defendant has met his burden, courts consider the following factors: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective

---

[6] "[T]he Supreme Court has made clear that 'definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" United States v. Bain, 874 F.3d 1, 13 (1st Cir. 2017) (quoting Rakas, 439 U.S. at 140). Nevertheless, because both the government and courts within the First Circuit refer to "standing" in the context of the Fourth Amendment, the court will use that nomenclature.

reasonableness of such an expectancy under the facts of a given case." Aguirre, 839 F.2d at 856–57. "The Aguirre factors provide a framework for analyzing standing, but '[n]o single factor determines whether an individual' has a protected Fourth Amendment expectation of privacy." United States v. Bates, 100 F. Supp. 3d 77, 83 (D. Mass. 2015) (quoting Oliver v. United States, 466 U.S. 170, 177 (1984)).

The government argues that Guerrero-Nuñez failed to allege any facts in his motion to suppress that are pertinent to the Aguirre factors and that, if anything, he has tried to distance himself from the apartment. At the evidentiary hearing, Guerrero-Nuñez argued that the evidence adduced at the hearing supported his reasonable expectation of privacy in both the apartment and the two cell phones. The court agrees.

Regarding the apartment, location data showed that the 5540 number, through which the undercover agents communicated with Guerrero-Nuñez, was near or at 478 Riverside Drive several times a day from November 20, 2023, to December 5, 2023. The pen register showed a WhatsApp account associated with that phone number using the Wi-Fi in Apartment 204 several times in February. Guerrero-Nuñez was pulled over on two separate dates, more than two years apart, in a Jeep that was registered to that address. Guerrero-Nuñez was in his underwear when officers entered the apartment. There were adult male clothes in the closet that appeared to belong to him, and there were bottles of prescription medication with his name on them in one of the bedrooms. These facts sufficiently establish that Guerrero-Nuñez historically used the apartment and had a subjective anticipation of privacy therein. Looking at the totality of the circumstances, the evidence demonstrates that Guerrero-Nuñez either resided in the apartment with Lara Lara or, at the very least, was a frequent overnight guest. As such, he has standing to assert a Fourth Amendment challenge to the officers' entry into the apartment. See Bain, 874

10

F.3d at 13 ("Under Supreme Court precedent, Bain's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.'" (quoting Minnesota v. Olson, 495 U.S. 91 at 96-97 (1990))).

The evidence also supports Guerrero-Nuñez's right to challenge the seizure of the cell phones. The undercover agents communicated with Guerrero-Nuñez on those phones and arranged numerous drug buys over the course of several months. They observed him silence a call that they placed to the 5540 number, and they were given the 2361 number to contact him, which they frequently did. They had geolocation data connecting the 5540 phone to the apartment and found at least one of the phones in the closet in which they found Guerrero-Nuñez hiding. On these facts, the court finds that Guerrero-Nuñez had possession and control of the phones, historically used them, and, given the nature of his communications with the undercover agents, subjectively expected those communications to remain private.

In addition, the government offered this evidence to support its contention that the agents had probable cause to connect the phones to Guerrero-Nuñez and to seize them on the day of his arrest. It cannot offer that evidence to support the seizure of the phones and prevent Guerrero-Nuñez from using these facts to support his standing. See United States v. Cardona, 411 F. Supp. 3d 113, 115 n.1 (D. Mass. 2019). The record evidence is sufficient to establish his standing to challenge the seizure of the phones.

II.    Entry Into the Apartment

Guerrero-Nuñez argues that the officers unlawfully entered the apartment. He contends that the warrant for his arrest did not give the officers authority to enter Apartment 204, and,

separately, that Lara Lara did not give the officers valid and voluntary consent to enter the apartment. He is wrong on both accounts.

### A.    Entry Pursuant to Arrest Warrant

"[P]olice officers attempting to execute an arrest warrant have 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" United States v. Werra, 638 F.3d 326, 336–37 (1st Cir. 2011) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)). "Even if it becomes known after entry that the residence is not the suspect's, the entry is justified if the police had reasonably believed that (1) the suspect resided at the location and (2) the suspect would be present." United States v. Hamilton, 819 F.3d 503, 506 (1st Cir. 2016) (quotations omitted). In analyzing the officers' reasonable belief, the court must "examine the information known to the officers in the totality and not in isolation." United States v. Graham, 553 F.3d 6, 14 (1st Cir. 2009).

The government argues that the officers reasonably believed that Guerrero-Nuñez resided in Apartment 204. It points to the location and pen register data discussed above, as well as Guerrero-Nuñez's presence in the Jeep registered to that address on two separate occasions spanning more than two years, including in January 2024. The court agrees that this evidence establishes that the officers reasonably believed that Guerrero-Nuñez resided in Apartment 204. See, e.g., United States v. Stewart, 102 F. Supp. 3d 392, 39-99 (D.R.I. 2015) (holding that officers reasonably believed that the defendant resided in an apartment associated with another individual when a car in which the officers had seen the defendant was parked outside the apartment building and the police had location data showing that the defendant's cell phone had been inside the apartment).

While Guerrero-Nuñez does not concede that the officers reasonably believed that he resided in Apartment 204, he disputes that point without substantial elaboration. Instead, he argues primarily that the officers did not have a reasonable belief that he would be present in the apartment at the time they arrested him. He notes that the testimony regarding the location and pen register data did not specify any time of day that the phone associated with the 5540 number was in the area or the apartment. However, there were several other pieces of evidence to support the belief that Guerrero-Nuñez would be present at approximately 12:30 p.m. on the date of his arrest.

Undercover agents had been communicating with Guerrero-Nuñez on the 2361 number throughout the morning to arrange the narcotics purchase in Portsmouth. Though the location and pen register data did not provide the time of day at which Guerrero-Nuñez and his phones were typically in the apartment, it did support a reasonable belief that Guerrero-Nuñez arranged drug buys from the apartment and was likely communicating with the undercover agents from that location on March 14, 2024. Moreover, the investigation connected Guerrero-Nuñez to the Jeep and there is no evidence that he was connected to any other vehicle. On March 14, 2024, officers began surveilling the apartment complex mid-morning. When they arrived, they did not see the Jeep. While they continued their surveillance, they did not see Guerrero-Nuñez leave the apartment. Only after the surveillance team observed Lara Lara return to the apartment in the Jeep did they execute the warrant for Guerrero-Nuñez's arrest.

Examining the totality of the circumstances, the evidence shows that the officers reasonably believed that Guerrero-Nuñez lived in Apartment 204 and would be present when they entered the apartment. As such, their entry into the apartment did not violate Guerrero-Nuñez's Fourth Amendment rights.

13

B.    Consent

Even if the officers did not have a reasonable belief that Guerrero-Nuñez lived and would be present in the apartment, the evidence demonstrates that Lara Lara validly and voluntarily consented to their entry. "The Fourth Amendment recognizes a valid warrantless entry . . . when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." Georgia v. Randolph, 547 U.S. 103, 106 (2006). To show that this exception to the warrant requirement applies, "the government has the burden to prove, by a preponderance of the evidence, two factbound elements." United States v. Antone, 479 F. Supp. 2d 255, 260 (D.R.I. 2007) (citing United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996)). "The first, often referred to as consent-in-fact, requires a showing that consent actually was rendered, whether it be done expressly through oral invitation or impliedly through gesture or conduct." Antone, 479 F. Supp. 2d at 260 (citations omitted). "The second typically more controversial element requires a showing that consent was voluntary; that is, 'the product of an essentially free and unconstrained choice,' and not 'the product of duress or coercion, express or implied.'" Id. (quoting United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) and United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003), respectively). Courts must examine the totality of the circumstances in determining whether the government carried its burden to show valid and voluntary consent. Pagán-González v. Moreno, 919 F.3d 582, 591 (1st Cir. 2019).

There is little doubt that the government proved that Lara Lara rendered her consent to the officers' entry into the apartment. The evidence shows that the officers identified themselves while in the hallway outside the apartment and asked Lara Lara's permission to enter. There is some evidence that Lara Lara verbally consented but there is no question that she voluntarily

stepped aside out of the doorway and allowed the officers to come into the apartment. Her movement under these circumstances is sufficient to show that she consented to the officers' entry into the apartment. United States v. Rodriguez, 931 F. Supp. 907, 918 (D. Mass. 1996) ("An objective manifestation of consent to a warrantless search may include a gesture such as stepping away after opening a door." (citing Robbins v. MacKenzie, 364 F.2d 45, 49 (1st Cir. 1966))).

Guerrero-Nuñez argues that the government has not proven the second element, that Lara Lara's consent was voluntary. He contends that her consent was coerced, noting that she was on federal supervised release and was confronted with eight to ten officers, all of whom had weapons. This evidence does not show that Lara Lara's consent was coerced. See United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993) (finding that the defendant's consent was not coerced "[n]otwithstanding the inherently unnerving effect of having numerous officers arrive at one's door with guns drawn," especially considering his prior interactions with law enforcement). "[N]one of the classic signs of consent unlawfully coerced exist in this record—no threats, brandishing of weapons, aggressive language, or the like." United States v. Fix, No. 08-20147-JWL, 2009 WL 211166, at *5 (D. Kan. Jan. 28, 2009); see United States v. Salomon-Castro, No. 23-CR-01843-KWR, 2024 WL 5119971, at *10 (D.N.M. Dec. 16, 2024) (noting that coercion that undermines voluntary consent includes when the "defendant suffered . . . 'physical mistreatment, use of violence . . . or threats of violence, promises or inducements, deception or trickery.'" (quoting United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999))).[7]

---

[7] In his motion, Guerrero-Nuñez also suggests that Lara Lara's consent was not voluntary because she did not speak English well enough to understand the officers. He abandoned that argument during the evidentiary hearing, but it would have failed in any event. The evidence shows that Lara Lara was able to understand the officers' questions and directions and could respond appropriately.

The government has carried its burden to show that Lara Lara's consent to the officers'

entry was valid and voluntary. Therefore, for this additional reason, the officers' entry into the

apartment did not violate Guerrero-Nuñez's Fourth Amendment rights.

III.    Calling the Phones

Although Guerrero-Nuñez's motion focuses primarily on the officers' seizure of the cell

phones, he requests that the court "suppress all evidence derived from the entry into 478

Riverside Road unit 204 in Lawrence, Massachusetts." Doc. no. 84 at 1. At the evidentiary

hearing, the government argued that, even if the court determined that seizing the cell phones

violated Guerrero-Nuñez's constitutional rights, the court should not suppress evidence that the

two cell phones rang when Special Agent Frigon dialed their numbers.

The question is whether the act of calling a cell phone constitutes a search. The District

of Massachusetts addressed this exact issue in United States v. Katana, No. CR 4:19-40024-TSH,

2021 WL 185547 (D. Mass. Jan. 19, 2021), aff'd, 93 F.4th 521 (1st Cir. 2024). As that court

noted, the "First Circuit Court has never specifically addressed whether or not a law enforcement

officer dialing what they believe to be an individual's cellphone number constitutes a search

under the Fourth Amendment." Id. at *2. Nevertheless, the Katana court held that

> [a] person has no legitimate expectation of privacy in their phone number given
> that it is shared with cellphone providers and other users. Thus, while the Katana
> phone was not in plain view when it was dialed, the act of dialing the defendant's
> phone number does not constitute a search under the Fourth Amendment. If a
> person wanted to keep their cell phone's location private, they could do so by
> turning off the phone. By having the phone turned on, a person allows any third

party to call them. Because a person has no reasonable expectation of privacy in their phone number, dialing that number does not constitute a search under the Fourth Amendment.

Id.

The court agrees with the reasoning set forth in Katana. Given that the officers were constitutionally permitted to be in the apartment, Guerrero-Nuñez had no legitimate subjective or objective expectation of privacy in the officers' observations of cell phones ringing after the officers dialed known numbers. Special Agent Frigon's act of dialing the cell phones does not constitute a search under the Fourth Amendment. As such, to the extent that Guerrero-Nuñez seeks to suppress evidence that Special Agent Frigon dialed both cell phone numbers and that they rang in the apartment, his motion is denied. The officers' authority to call the phones and observe them ringing does not, however, determine whether the Fourth Amendment permitted the officers to seize the cell phones.

IV.    Seizure of the Cell Phones

"The very core of [the Fourth Amendment's] guarantee is the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." Caniglia v. Strom, 593 U.S. 194, 197–98 (2021) (quotations and alterations omitted). Therefore, "searches and seizures inside a home without a [search] warrant are presumptively unreasonable." Michigan v. Fisher, 558 U.S. 45, 47 (2009) (quotations omitted).

There are certain exceptions to the warrant requirement that allow officers to seize items without a warrant. It is the government's burden to show that these exceptions apply. See United States v. Wurie, 728 F.3d 1, 11 (1st Cir. 2013). For example, under certain circumstances, an officer may seize an item that is within his or her plain view. United States v. Allen, 573 F.3d 42,

51 (1st Cir. 2009). In addition, an officer may conduct a warrantless seizure of an item if exigent circumstances exist. Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 24 (1st Cir. 2016).

These two exceptions are at the heart of the government's response to Guerrero-Nuñez's motion to suppress. As discussed above, the officers were authorized to enter Apartment 204 to execute Guerrero-Nuñez's arrest pursuant to the arrest warrant and with Lara Lara's consent. The government does not argue that this authority allowed the officers to search the apartment or seize any items therein. Therefore, the government must establish that an exception to the warrant requirement applies. It argues that the officers were entitled to seize the phones both because they were in plain view and because exigent circumstances justified seizing the phones before they could obtain a warrant.

A.    Plain View

The plain view "doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." United States v. Hernandez-Mieses, 931 F.3d 134, 140 (1st Cir. 2019) (quotations omitted). The government argues that it can meet this test because the officers were lawfully in the apartment, and they saw the two phones in plain view after they dialed the numbers associated with those phones and heard them ring.[8]

_____

[8] The government also argues that the officers had probable cause to seize the phones because cell phones are a common tool of the drug trade and undercover agents had executed several drug buys over both phones. The court need not reach that argument for the reasons discussed below.

There are two problems with the government's argument, both of which highlight the same issue—there is no evidence that the cell phones were actually in plain view. First, the evidence about the locations of the cell phones when they were seized is unclear. Special Agent Frigon testified that he called both cell phones, and that he was notified by Special Agent Silvestro that the phones rang in the bedroom. He further testified that Special Agent Silvestro told him that both phones had been found in the closet where Guerrero-Nuñez had been hiding. However, Special Agent Silvestro testified that he found the first phone in the closet, and that he could not recall where he found the second phone. More importantly, there was no testimony that either phone was "clearly visible" when Special Agent Silvestro located them.

Second, even if the phones were clearly visible at that point, they would not have been until and unless Special Agent Frigon called them—there was no testimony that the officers observed the phones during Guerrero-Nuñez's apprehension or the protective sweep. The government argues that this set of facts satisfies the plain view exception; that the officers' act of calling the cell phones to determine their location can bring the phones within the confines of the plain view exception.

The government offers little legal support for its argument. During the hearing, the government pointed to United States v. Katana, focusing on the case's holding that the act of dialing a phone number does not constitute a search. But that holding is not relevant to the plain view analysis. Whether Guerrero-Nuñez's Fourth Amendment rights were violated when Special Agent Frigon called the cell phones is a separate question from whether Guerrero-Nuñez's Fourth Amendment rights were violated when the officers seized the phones. Indeed, Katana itself acknowledges this distinction. See Katana, 2021 WL 185547, at *2 ("While the dialing of

the phone does not constitute a search under the Fourth Amendment, the seizure of that phone does implicate Fourth Amendment concerns.").

The plain view exception applies only if the cell phones "were easily visible to the naked eye." Hernandez-Mieses, 931 F.3d at 140. They were not. The officers did not see the cell phones while they were arresting Guerrero-Nuñez or during the protective sweep. The officers saw them only after Special Agent Frigon dialed their numbers and Special Agent Silvestro followed the sound of their ringing. Even if both phones were clearly visible to Special Agent Silvestro at that point—again, a fact that the court cannot find on the evidence offered at the suppression hearing, especially considering the clutter in the closet and Special Agent Silvestro's inability to remember where the phones were found—these circumstances do not satisfy the plain view exception. If the officers needed to call the cell phones in order to locate them, they were not easily visible to the naked eye or in plain view. Cf. United States v. Mejia-Velazquez, No. 1:21-CR-00137-SDG, 2023 WL 120621, at *9 (N.D. Ga. Jan. 6, 2023) (granting motion to suppress seizure of cell phone because "the officers had no probable cause to seize either cellphone until Special Agent Clutter took an additional action (i.e., calling the cellphone) unrelated to the objectives of the authorized safety sweep (i.e., to look for persons or objects that might pose a risk to the officers' safety")). Therefore, the plain view exception did not authorize the officers' seizure of the cell phones.

B.    Exigent Circumstances

The exigent circumstances exception to the warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." Lange v. California, 594 U.S. 295, 301 (2021) (quotations

omitted). To "show exigent circumstances, the police must reasonably believe that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." Belsito, 845 F.3d at 24 (quotations omitted). This is a "heavy burden," French v. Merrill, 15 F.4th 116, 133 (1st Cir. 2021), which "should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects," United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005) (quotations omitted).

The government argues that the officers were concerned about preserving the data on the phones. The "imminent destruction or removal of evidence" is a commonly recognized exigent circumstance allowing for the warrantless seizure of evidence. United States v. Rodríguez-Pacheco, 948 F.3d 1, 7 (1st Cir. 2020). As several courts have recognized, it is technologically possible to wipe certain phones remotely. See, e.g., Riley v. California, 573 U.S. 373, 388-89 (2014). And, of course, a person with physical access to a phone may have the ability to erase its contents or destroy it. That possibility does not entitle officers to effect a warrantless seizure or search of every cell phone in every case. Instead, the government must point to specific facts in each case to support an objective belief that, absent the warrantless seizure, the phones were at an imminent risk of being wiped or destroyed. Samboy, 433 F.3d at 158.

On this point, the government relies entirely on Special Agent Frigon's testimony. He stated that he had learned in training that third parties can remotely erase data from cell phones. He recalled that this training had been primarily about iPhones, and he could not recall working on a case in which a cell phone had been remotely wiped. To guard against remote wiping, officers could place a cell phone in a mylar evidence bag. According to Special Agent Frigon, "in theory" this bag blocks out radio frequencies that would allow a third party to call or remotely wipe a phone; however, he stated that he had heard phones ring while inside those bags.

In any event, neither he nor Special Agent Silvestro could recall whether they had mylar evidence bags at this scene. Special Agent Frigon also testified that placing a phone in airplane mode could prevent remote wiping if officers could bypass a locked screen, which they can sometimes do with iPhones.

With regard to the possibility of manually erasing or destroying the phones, the testimony was even more limited. Special Agent Frigon testified that the phones could be physically accessed by a third party if the officers did not immediately seize them, and that they had not received confirmation that all five targets had been arrested that day. In addition, Lara Lara would have had physical access to the phones if they were left in the apartment with her after Guerrero-Nuñez's arrest.

This evidence does not "show an objectively reasonable basis for concluding that the loss or destruction of evidence is likely to occur" absent warrantless seizure of the phones. Samboy, 433 F.3d at 158. There was no evidence that any officer had been involved in a case in which a cell phone had been wiped, remotely or otherwise, or that such activity is common in narcotics cases. There was also no evidence to support any particularized concerns about Lara Lara's or any co-conspirator's ability to wipe the phones remotely or the likelihood that they would manually erase or destroy the phones before the officers could obtain a warrant. The only evidence to support concerns about erasing information from phones was testimony that Special Agent Frigon had received training regarding remote wiping. But even if that training were sufficient to establish exigent circumstances in this case—which it is not—Special Agent Frigon testified that the training had pertained primarily to Apple products and the two phones in this case were manufactured by Samsung.

The government disagrees, and again cites Katana to support its position. In Katana, the District of Massachusetts denied the defendant's motion to suppress the search and seizure of his cell phone. 2021 WL 185547, at *3. The court held that exigent circumstances justified the officers' warrantless search and seizure of the phone because "[i]t was reasonable for the law enforcement officers to believe that Katana's cell phone was going to be removed from the premises, and/or destroyed." Id. at *2.

But Katana does not help the government; to the contrary, it only underscores the government's failure to establish exigent circumstances in this case. In Katana, as here, the officers knew that the defendant's cell phone had been involved in his crimes. During Katana's arrest, however, the officers "observed a cell phone near where the Defendant had been seated prior to his arrest, they observed his brother pick a phone up, and heard a phone in his pants ring when they dialed Katana's number." Id. The court held "that the officers had probable cause to seize the phone and that exigent circumstances, namely the imminent removal of the phone by Katana's brother made the obtaining of a warrant impractical." Id. (emphasis added).

In contrast, the government here offered no "particularized, case-specific facts" to support an objective belief that the cell phones were in imminent danger of being wiped or destroyed such that the officers were justified in seizing the phones without a warrant.[9] Samboy, 433 F.3d at 158; cf. United States v. Sanchez, No. 217CR136FTMUAMRM, 2018 WL 5724312, at *3 n.3 (M.D. Fla. Nov. 1, 2018) (noting that a reasonable officer would have reason to fear

---

[9] Although the court evaluates the evidence under an objective standard, see Kentucky v. King, 563 U.S. 452, 464 (2011), it is worth noting that there was no evidence that the officers who seized the phones were actually concerned about the possibility that they could be remotely wiped absent their immediate seizure. There was no evidence that the officers had mylar bags that day, that they put the phones in those bags if they did have them, or that they put either of the phones in airplane mode.

that the subject cell phone would be wiped before he could secure a search warrant where the defendant was not in custody, told officers that others had access to the phone, and was aware that officers were looking for his phone), aff'd, 30 F.4th 1063 (11th Cir. 2022).

Neither the exigent circumstances exception nor the plain view exception applies in this case. Therefore, the warrantless seizure of the cell phones violated Guerrero-Nuñez's Fourth Amendment rights. His motion is granted to the extent that it seeks to suppress evidence gained from the seizure of the phones.

Conclusion

For the foregoing reasons, the defendant's motion to suppress (doc. no. 84) is granted to the extent that it seeks to suppress evidence gained from the seizure of the two cell phones but is otherwise denied.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

February 12, 2025

cc: Counsel of Record